PLATTE CITY BENEFIT ASSESSMENT SPECIAL ROAD DISTRICT v. J. W. COUCH, Appellant.—8 S. W. (2d) 1003.

Division One, July 3, 1928.

490

*L. C. Harper* for appellant.

*A. D. Gresham* and *James S. Simrall* for respondent.

492

ELLISON, C.—This is a suit brought by Platte City Benefit Assessment Special Road District of Platte County to foreclose its seven special tax bills against the defendant's land aggregating $1135.36, including interest. From a judgment and decree for plaintiff the defendant appeals. The answer, motion for a new trial and assignments of error bristle with constitutional questions, State and Federal, but as we think one question is decisive of the case, we shall proceed to a statement of facts leading up to it.

The district was organized in February, 1920, under Laws 1913, pp. 677-695, now Article VIII, Chapter 98, Sections 10833-10857, Revised Statutes 1919. These statutes are long and intricate, and we shall not attempt to do more than set out the substance of those immediately involved. Suffice it to say, Sections 10841 et seq. authorize the permanent improvement of any designated road in the district by special assessment against all the land therein, upon petition of the owners of a majority in acreage of the land in the district within one-half mile of the proposed road improvement. The special assessment is to be paid in from one to fifteen installments as the petition may request; in this case it was one.

Whenever such a petition is filed with the commissioners of the district they are required to have made a map of the district showing the road to be improved; also a profile of the road, plans and specifications for the improvement, and an estimate of the cost thereof. All these are to be submitted to "the state highway engineer" for approval, and when so approved, the road commissioners make a list of all the lands in the district and put a valuation thereon, showing on the list what lands lie within one-half mile, what

within a mile, what within one and one-half miles, and what at a greater distance of the road improvement.

When matters have reached this stage the commissioners file the landowners' petition, the map, profile, plans and specifications, estimate and land list with the clerk of the county court, who thereupon gives notice by publication that the court will on a day certain consider protests, objections and exceptions to the project. Persons owning land in the district within one-half mile of the road improvement may file written protests there against, and anyone interested in any land in the district may appear and show reason why the road improvement cannot be made by special assessment as proposed. This part of the procedure is covered by Section 10842, Revised Statutes 1919, which is supposed to be the same as Section 10620, Laws 1913, pp. 684-686; but, evidently through mistake, following the word "such" and before the word "approval" in the third line of said Section 10842, all that part of the section appearing on page 685, Laws 1913, has been omitted. So reference to the session acts is necessary to get the full text of the legislation.

If, on hearing and consideration of the objections and protests, the court finds that the owners of a majority of the acreage in the district within one-half mile of the improvement have protested, or if sufficient reason be shown why the improvement should not be made by special assessment, the court is required to dismiss the petition—at the cost of the petitioners, first ascertained and adjudged. But if the court finds otherwise, then further hearings are held to consider objections or exceptions (if any) to the facts and valuations shown on the land list. Any necessary changes or corrections having been made in these, the list is approved by the court and a special assessment levied against all the land in the district for the cost of the improvement shown by the estimate, plus the petitioners' expenses, including a reasonable attorney fee, plus probable future working, administrative and incidental expenses, plus ten per cent of the whole for emergencies. The county court also enters an order that the improvement be made in accordance with the plans and specifications. [See discussion of Section 10847, infra.]

The tax is apportioned on the basis of the valuations given in the land list, land in the first zone, or first half mile, being taken at one hundred per cent of the valuations there fixed; land in the second zone, or second half mile, at seventy-five per cent of the listed valuation; land in the third zone, or third half mile, at fifty per cent of that valuation; and land in the fourth zone—more than one and one-half miles from the road—at twenty-five per cent of that valuation. If, as in this case, the assessment is payable in one installment, the clerk of the county court then makes out a tax bill against each

tract of land in the district for the amount assessed against it, which constitute a lien. The bills are deposited with the county treasurer, and notice of that fact given by publication.

If any such special tax bills remain unpaid for thirty days the commissioners may borrow money up to the aggregate amount thereof, but neither the road district nor the commissioners shall be obliged to repay said money borrowed except out of the collections on said delinquent bills. If arrearages continue for a year suit for foreclosure must be brought by the road district. All money collected on said tax bills, or borrowed in anticipation of the payment thereof, including interest, shall be used only:

"To pay the cost and expense incurred by the commissioners, as found by the court, in the preparation of such plans, specifications, estimate, map and profile, and said list of lands, and a reasonable attorney's fee, as found by the court, for such petitioners, *and to pay the cost of improving said public road or part of a public road in accordance with the plans and specifications so filed with the clerk of the county court,* and such working, administrative and incidental expenses, not otherwise provided for by law, as may be incurred in making such improvement and in procuring, collecting and paying the cost of such improvement, and the balance, if any, shall be used in paying expenses of maintaining such improvement; . . . " (Italics ours.)

Section 10847, Revised Statutes 1919, then goes on to say that "whenever an order for improvement is made" (by the county court, supra) "the commissioners of the district shall, in the name of the district, enter into a written contract with the lowest and best bidder for making such improvement in compliance with such order." The contract price shall not, in any event, be in excess of the estimated cost of the work as found by the county court, plus ten per cent; and shall not provide for payment of exceeding eighty per cent of the value of the work actually done, until the whole improvement is completed. Payments made are to be by warrants of the county treasurer.

So much for the road district law. The facts are that the district was duly incorporated and that in conformity with the foregoing procedure a petition was filed in the office of the County Clerk of Platte County, apparently on March 15, 1921, for the improvement of the road between Platte City and Parkville, leading southeast from Platte City nearly seven miles to the "Elgin corner" and thence nearly south about seven miles to Parkville. On December 6, 1921, the county court fixed the total cost of the improvement at $39,452.08, ordered a special assessment in that sum against the land in the district, and ordered the improvement of the road in ac-

cordance with the plans and specifications filed. The tax bills in controversy were issued the same month, on December 31, 1921.

In the meantime the Centennial Road Law was passed on August 4, 1921. [Laws 1921 (1 Ex. Sess.) pp. 131, 145, 158.] By Section 29 thereof a state highway system of hard surfaced roads was established, to be constructed, maintained and paid for by the State. That section provided that the highway system in Platte County should go along the following route (in part): "Platte City, thence southeastwardly through Parkville, to the Platte-Clay County line, at the southeast corner of Platte County." The designing and construction of these roads were placed in the hands of the State Highway Commission. The Highway Commission was also authorized and empowered to locate and construct 1500 miles of "high type" or primary road connecting the principal population centers of the State.

The State Highway Commission selected the Platte City-Parkville road as a part of the state highway system, designating that part thereof from the Elgin corner northwest into Platte City as a "higher type" or primary road, and that part from the Elgin corner south to Parkville as a secondary road. This was done under a private verbal arrangement with the road district commissioners, whereby the latter were to abandon the construction of the improvement and to turn over to the State Highway Commission the proceeds from the tax bills, to the amount of $38,352.08. To this was to be added about $22,500 of state money and the same amount of Federal-aid money, making a fund of over $93,000 available for the project.

Apparently this arrangement was made before the county court ordered the road improvement and levied the special assessment. It was before the tax bills were issued, at any rate, for the testimony for the road district, by one of its commissioners, was as follows:

"Well, when we issued our tax bills, why we issued them with the understanding that we was issuing them to raise money for the State Highway Board, to turn half of it over to the State Highway Board, our part, and they were to put half, and then with the Morgan and McCullough money, they was to do the work. That was the understanding when we issued our tax bills.

"That was an understanding between the commissioners and the State Highway Department and just known to the two. After the Morgan and McCullough money was spent the district and the Highway Department was each to pay one-half the cost of the road."

So the road district abandoned construction of the improvement according to its own plans and specifications, let no contract, and on April 28, 1922, turned over to State Highway Commission $38,000, or thereabouts, of the money raised by the tax bills—all that was paid in

except $1120. The State Highway Commission changed the plans and specifications and rerouted the road (for the better, it is true), leaving Platte City at a point about 1020 feet south of the original starting point and cutting out about a mile of it at that place. Nearly three miles further south they eliminated about three-fourths of a mile, and about six miles south, one and one-eighth miles. This was done by cutting through farms instead of going around them. It improved the grade and shortened the distance, in all omitting nearly three miles of the seven-mile distance between Platte City and the Elgin corner, as originally planned by the road district. So one of the respondent's commissioners testified. The length was substantially shortened and the course varied for three-sevenths of the distance.

The entire road from the Elgin corner south to Parkville had been graded and bridged at the time of the trial below. From that corner north to Platte City about one-third the distance had been graded and bridged, and the contract let for grading the remaining distance. Up to that date, $20,742 of the road district's money had been spent on the north and south portions of the road. Mr. Menefee, construction auditor for the State Highway Commission, testified that only $29,940.70 of the road district money would be used on the project, and that the remainder of the $38,000 would be returned to the district.

Do the foregoing facts show a sufficient compliance with Article VIII, Chapter 98, Revised Statutes 1919, to validate the tax bills; and if not, is there anything in the Centennial Road Law to bolster up the whole proceeding? In our opinion both questions must be answered in the negative.

The taxes were not taxes in the ordinary sense, but special benefit assessments. The title and text of the act so declare. And since it is a fundamental principle of our jurisprudence that a man's property shall not be taken without his consent except by due process of law, and such proceedings are *in invitum,* the general rule is that there must be a strict observance of the statutes enacted for that purpose. [Heman Const. Co. v. Lyon, 277 Mo. 628, 636, 211 S. W. 68; 2 Elliott, Roads & Streets (4 Ed.) 664, 665, pp. 814-7; 4 Dillon, Municipal Corporations (5 Ed.) 1402, p. 2450; 1 Page & Jones, Taxation by Assessment, secs. 229, 234, pp. 356, 360.] The harshness of the rule has been ameliorated some, especially with respect to drainage projects in view of their beneficent purposes (In re Big Lake Drainage Dist. v. Rolwing, 269 Mo. 161, 190 S. W. 261); and there is good reason for regarding road improvement districts with favor. But it is also true that no such public improve-

ment project, however worthy its purpose, can stand except upon a legal foundation.

It is plain from the most casual reading of Article VIII, Chapter 98, that the proceedings there authorized contemplate from the beginning a specific road improvement. They are built around that. When the petition therefor is filed with the county court, plans and specifications, a profile and an estimate accompany it. The law does not allow the court to make changes. It holds a hearing and orders in or rejects the identical improvement as proposed. If the project is approved a benefit assessment is made, and the road commissioners then contract in writing with the lowest and best bidder for the construction of *that* improvement, not some other.

Now it stands conceded in this case that before the tax bills had been issued, and perhaps even before the improvement had been ordered by the court and the assessment made, the commissioners of the road district entered into a private, verbal arrangement with the State Highway Commission whereby the original project was cast aside and another improvement substituted. The purpose was commendable, and the parties are not subject to criticism, but from a legal standpoint the departure was so glaring that we cannot by any stretch of the imagination say the law was followed, or that the improvement agreed upon was substantially the same as that provided for in the prior proceedings, which are the foundation for the tax bills. Not only was the length of the road materially shortened, the course changed and the construction cost multiplied by two and one-half (nearly), but the road substituted was a state highway which the law says shall be built at the expense of the *State;* and we are asked to sustain tax bills *issued* to pay over a third of the cost of that road.

The appellant has cited a large number of cases in which special assessment paving tax bills were issued to contractors. In these a failure to install the paving improvement substantially in accordance with the municipal proceedings and contract was held to invalidate the tax bills. Respondent argues these cases are not in point because the law applicable to the case at bar contemplates the tax bills shall be issued *before* the improvement is constructed. We are prepared to concede there is a difference. When the statute so provides, special tax bills may be issued and collected before the completion, or even the commencement of the improvement, but that does not help respondent any. In such instances the law presumes the authorities will do their duty and build the improvement later, in due course (Heman Const. Co. v. Lyon, supra, 277 Mo. l. c. 641; McGhee v. Walsh, 249 Mo. 266, 285, 155 S. W. 445); but in this case we have an *admis-*

*sion* that before the bills were issued there had been a complete abandonment of the only improvement that would support them.

On the other hand, respondent cites a number of cases in which the credit of a municipality had been pledged, or securities negotiable in nature issued to pay for improvements built by special assessment—cases like Rose v. Springfield Road Dist., 275 Mo. 590, 205 S. W. 54, State ex rel. Carter v. Hamilton, 94 Mo. 544, 550, 7 S. W. 583, and H. & St. J. Rd. Co. v. Marion County, 36 Mo. 294, 306. Attention is then called to the fact that the appellant's answer pleads the respondent is not the owner of the bills sued on or the real party in interest, and it is argued this should be taken as an admission that the bills have been sold, bringing the case within the foregoing authorities. This contention cannot be upheld. The respondent sues on the bills as owner, and there was no contrary evidence or theory at the trial, so far as the record shows. The statutes do not provide for the sale or hypothecation of such tax bills. They are required to be deposited with the county treasurer as soon as issued and remain in his custody. Payments thereon are made to him. The statute expressly requires that suit thereon be brought by the road district as plaintiff. It is true the act authorizes the commissioners to borrow money not exceeding the aggregate amount of the delinquent bills, and provides the same shall be repaid only from collections on these bills; but it is plain the lenders do not in any sense become the owners of the tax bills. If it were otherwise they could hardly claim to be "holders in due course," because tax bills are not negotiable instruments. [Richter v. Merrill, 84 Mo. App. 150; Barber Asphalt Co. v. Ridge, 169 Mo. 376, 383, 68 S. W. 1043; 2 Page & Jones, Taxation by Assessment, sec. 1133, p. 1828.]

From the facts and legal conclusions above set out we are well convinced that the tax bills sued on cannot be sustained under the special road district benefit assessment law, Article VIII, Chapter 98, supra. Respondent urges against this certain further general considerations, such as that the road district has, or will have when the project is completed, a better improvement than they bargained for, and that it has cost them no more—less, even—than if they had built the road according to their own plans and specifications. This is true, but there is another side to it. The road they have is one they would have had for nothing, had the State Highway Commission seen fit to locate it there independent of the arrangement made with the road district commissioners. In other words, the landowners are specially assessed to pay part of the cost of a state highway. Can that be done under the Centennial Road Law, and if so, was the law followed in this case?

The record is not clear as to just how the building of the road was to be financed under the arrangement with the State Highway Commission. It appears it was to be constructed as far as the money would go under the McCullough-Morgan Road Law with Federal Aid money and local money, and the State also was to contribute money under the Centennial Road Law. Sections 10897, 10899 and 10901 (R. S. 1919) of the McCullough-Morgan Road Law, as carried forward by Section 2 of the Centennial Road Law, and Sections 33, 34 and 35 of the latter, cover situations in which the State Highway Commission was permitted at the times here involved to take over improved roads previously built by counties or civil subdivisions, or roads in course of construction or contracted for, and they also cover situations in which money raised by these local units might be used in the construction of state highways.

It would unduly extend the opinion to discuss these provisions separately or in detail. Section 10897, Revised Statutes 1919, and Section 34 of the Centennial Law seem to come nearest. The latter says "any county or other civil subdivision having funds of its own arising from a road tax or bond issue may spend said funds in the building of the state road system" therein. But the Legislature evidently did not intend by this or any of the other sections mentioned to authorize the diversion of funds raised by special assessment under Article VIII, Chapter 98, for one purpose, and their application to another under different auspices. If such were the intention it could not stand. It would be like trying an ordinary lawsuit against a man and taking judgment, without process or appearance. And the fact that a cash refund would be made to the district can make no difference. The indirect result of that would be the raising of cash for the district by special assessment, a purpose wholly foreign to the special assessment proceedings. In our opinion the tax bills cannot be sustained.

To save misunderstanding it may be well to add that the conclusions reached bear only on the right of the district to recover on the unpaid tax bills in suit, and that they have no reference to the right of the district to retain money collected on tax bills which were paid. That is a question governed by different principles.

The judgment is reversed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.